IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

**NATIONWIDE MUTUAL FIRE**
**INSURANCE COMPANY,**

      Plaintiff,

v.                                                           **CIVIL ACTION NO. 3:12-CV-4**
                                                                **(JUDGE GROH)**

**BOYD S. FAIRCLOTH;**
**TONY M. ELLIOT;**
**MICHELLE J. ELLIOT; and**
**ALLEN W. ELLIOT, SR.,**

      Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before this Court are the Defendants' Motion for Partial Summary Judgment [Doc.34], filed on June 8, 2012, as well as Plaintiff Nationwide Mutual Fire Insurance Company's ("Nationwide") Motion for Summary Judgment on Declaratory Judgment Action [Doc. 41], filed July 13, 2012. These motions have since been fully briefed and are now ripe for adjudication. Having reviewed and considered the arguments of the parties, this Court concludes that the Defendants' Motion for Partial Summary Judgment must be **DENIED**, and that the Plaintiff's Motion for Summary Judgment on Declaratory Judgment Action must also be **DENIED**.

## BACKGROUND

On April 18, 2011, Defendant Boyd S. Faircloth ("Mr. Faircloth") was allegedly injured when attacked by a dog, "Diver," owned by Defendant Allen W. Elliot, Sr. ("Mr. Elliot, Sr.") and kept on property owned by Defendants Tony and Michelle Elliot. Following

the incident, the Berkeley County, West Virginia Animal Control Officer determined that Diver was the aggressor in the incident and removed Diver from the Elliots' property. The Berkeley County Animal Control Officer further determined that Diver was a mixed breed American Pit Bull Terrier.

At the time of the incident, the Elliots were insured under a homeowner's policy ("the Policy") issued by Plaintiff Nationwide Mutual Fire Insurance Company ("Nationwide"). Accordingly, the Elliots notified Nationwide of the incident and Nationwide undertook an investigation. On April 20, 2011, Nationwide claim representative Lori Fallon interviewed the Elliots. Each confirmed that Diver had attacked Mr. Faircloth and caused him injury. The Elliots also vaguely mentioned another dog, a hound mix named "Holly," having been present at the scene, although Holly's level of involvement in the attack on Mr. Faircloth is unclear from the record. Because the Elliots stated that Diver was a mixed breed pit bull during their respective statements, on April 21, 2011, Nationwide issued a "reservation of rights" letter to Tony and Michelle Elliot, informing them that, if it was confirmed that Diver was a mixed breed pit bull, coverage would be excluded pursuant to the following exclusion contained in the Elliots' homeowner's policy:

> Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to bodily injury or property damage;
>
> . . .
>
> caused by any of the following animals owned by or in the care of an insured:
>
> (1)　the following types of pure bred dogs or a mix breed including one of these types:
>
> 　　(a)　American Staffordshire Terriers, American Pit

> Bull Terriers, or Staffordshire Bull Terriers, all commonly known as Pit Bulls . . . .

*See* Policy, pg. H3.

Nationwide subsequently had Diver DNA tested, which confirmed that Diver is a mixed breed dog, commonly known as a "pit bull," which includes Staffordshire Bull Terrier and Bull Terrier Cross crossed with American Staffordshire Terrier Mix. After confirming that Diver was a mixed breed "pit bull," Nationwide issued a denial of coverage on May 6, 2011, for Mr. Faircloth's claim.

By letter dated November 17, 2011, counsel for Mr. Faircloth sent Nationwide a demand letter requesting that Nationwide reconsider its denial of coverage. In response thereto, Nationwide filed the instant declaratory judgment action seeking a declaration from this Court that coverage did not exist under the Policy for any damages caused by Diver.

On February 1, 2012, the Elliots filed their Answer to the Complaint for Declaratory Judgment, alleging that Holly had also been involved in the attack on Mr. Faircloth. Nationwide asserts that upon receiving this information, it reopened its investigation and, once it confirmed that Holly was not an excluded dog under the Elliots' policy, began active negotiations to settle Mr. Faircloth's personal injury claims.

On April 20, 2012, Nationwide reached a settlement with Mr. Faircloth for the sum of $30,000.00. The release executed by Mr. Faircloth provided that:

> This compensation is not for injuries or damages caused by Diver, as it is an excluded breed of dog. However, in exchange for this compensation, it is our agreement that no additional action will be sought against Tony and Michelle Elliot and Allen W. Elliot, Sr., and that this is a full and final release of all claims related to the loss that occurred on 4-18-11 regardless of which dog caused any injuries or damages.

3

On April 4, 2012, the Elliots filed an Amended Answer to the Complaint for Declaratory Judgment in which they included a counterclaim against Nationwide. In their counterclaim, the Elliots allege that "Nationwide's Complaint for Declaratory Judgment mentions only one dog, Diver, as part of the underlying incident . . . [h]owever, another dog, Holly, [also] contributed to the underlying incident . . . ." According to the Elliots, "Holly is an English Foxhound mix crossed with Treeing Walker Coonhound," and as such, "incidents involving Holly would not be excluded from coverage under Nationwide's policy . . . [and therefore] Nationwide has an affirmative duty to settle Mr. Faircloth's claim and to defend and indemnify the Elliots in any litigation brought against them related to such claim." The Elliots thus allege that "Nationwide's failure properly to investigate this claim, its failure to defend and indemnify the Elliots and its failure to extend coverage to Mr. Faircloth constitute a breach of its contractual obligations to the Elliots and a breach of its duty of good faith and fair dealing . . . [as well as] West Virginia's Unfair Claims Settlement Law, W. Va. Code §33-11-4, *et seq.*" The Elliots allege that they "are entitled to recover damages from Nationwide resulting from Nationwide's breaches, including all compensatory and other contractual damages . . . [as well as] their reasonable attorney's fees, their damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience and, to the extent that Nationwide acted maliciously, to punitive damages."

On June 8, 2012, the Defendants moved for partial summary judgment with regard to their claim for attorney's fees and costs. On July 20, 2012, Nationwide filed a Response. On July 26, 2012, the Defendants filed their Reply. This matter is now ripe.

On July 13, 2012, the Plaintiff moved for summary judgment on the declaratory

4

judgment count contained in its Complaint. On August 2, 2012, the Defendants filed a Response. On August 16, 2012, the Plaintiff filed its Reply. This matter is now ripe.

## DISCUSSION

### I. Jurisdiction

The Court's subject-matter jurisdiction over this action is grounded in diversity pursuant to 28 U.S.C. §1332. Pursuant to that Code section,

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between . . . citizens of different states.

Nationwide is an Ohio corporation which has its principle place of business in Columbus, Ohio. The Defendants are all residents of Berkeley County, West Virginia. The amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs, because the insurance policy at issue provides $300,00.00 in personal liability coverage and $1,000.00 in medical payments coverage.

### II. Standard of Review

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation. ***JKC Holding Co. LLC v. Washington Sports Ventures, Inc.***, 264 F.3d 459, 465 (4th Cir. 2001) (citing ***Hooven-Lewis v. Caldera***, 249 F.3d 259, 265 (4th Cir.2001)). Mere speculation by the non-movant

cannot create a genuine issue of material fact. *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir.2001). A material fact is one where its existence or non-existence could result in a different jury verdict. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995).

The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### III. Analysis

#### A. Applicable Law

As this case involves an insurance contract entered into in West Virginia, the Court will apply the substantive law of the State of West Virginia. See *M & S Partners v. Scottsdale Ins. Co.*, 277 Fed.Appx. 286, 289 (4th Cir. 2008) ("West Virginia courts generally use *lex loci delicti* to resolve choice of law conflicts . . . .").

Pursuant to West Virginia law, "[w]henever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's

reasonable attorney's fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience." Syllabus Pt. 1, **Hayseeds, Inc. v. State Farm Fire & Cas.**, 352 S.E.2d 73, 177 W. Va. 323 (W. Va. 1986). However, "[a]n insured cannot be held liable for punitive damages by its refusal to pay on an insured's property damage claim unless such refusal is accompanied by a malicious intention to injure or defraud." Syllabus Pt. 2, **Id.**

**Hayseeds** thus creates a right to attorney's fees and incidental damages whenever an insured is forced to sue its insurer in order to enforce an insurance contract and the insured "substantially prevails." "A **Hayseeds** claim may well be unique to West Virginia," **First Financial Ins. Co. v. Hammons**, 58 Fed.Appx. 31, 35 (4th Cir. 2003), and has been expanded to apply not only to property damage claims, but to all first party insurance claims. **Hadorn v. Shea**, 456 S.E.2d 194, 193 W. Va. 350 (W. Va. 1995).

"An insured 'substantially prevails' . . . when the action is settled for an amount equal to or approximating the amount claimed by the insured immediately prior to the commencement of the action, as well as when the action is concluded by a jury verdict for such an amount. In either of these situations the insured is entitled to recover reasonable attorney's fees from his or her insurer, as long as the attorney's services were necessary to obtain payment of the insurance proceeds." Syllabus Pt. 1, **Jordan v. National Grange Mut. Ins. Co.**, 393 S.E.2d 647, 183 W. Va. 9 (W. Va. 1990).

"The question of whether an insured has substantially prevailed against his insurance company on a property damage claim is determined by the status of negotiations between the insured and the insurer prior to the institution of the lawsuit. Where the

7

insurance company has offered an amount materially below the damage estimates submitted by the insured, and the jury awards the insured an amount approximating the insured's damages, the insured has substantially prevailed." Syllabus Pt. 1, *Hadorn*, *supra*.

"An insurance carrier has a duty, once a first-party policyholder has submitted proof of a loss, to promptly conduct a reasonable investigation of the policyholder's loss based upon all available information. On the basis of that investigation, if liability to the policyholder has become reasonably clear, the insurance carrier must make a prompt, fair and equitable settlement offer." Syllabus Pt. 3, *Miller v. Fluharty*, 500 S.E.2d 310, 201 W. Va. 685 (W. Va. 1997).

> [T]he [West Virginia Unfair Trade Practices Act] makes clear that an insurance company must fully investigate an insurance claim, and make a reasonable offer to settle the claim if warranted by the evidence. W. Va. Code §33-11-4(9)(c) requires an insurance company to have "reasonable standards for the prompt investigation of claims arising under insurance policies," while W. Va. Code §33-11-4(9)(d) states that the company may not "refus[e] to pay claims without conducting a reasonable investigation based upon all available information[.]" With the information obtained from the investigation, W. Va. Code §33-11-4(9)(f) requires the insurance company to "attempt[ ] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

*Rose ex rel. Rose v. St. Paul Fire and Marine Ins. Co.*, 599 S.E.2d 673, 681, 215 W. Va. 250, 258 (W. Va. 2004).

### B. Application

#### 1. Defendants' Motion for Partial Summary Judgment

In their Motion for Partial Summary Judgment, the Defendants argue that

Nationwide's delay in properly investigating and settling Mr. Faircloth's claim entitles the Defendants to recover their attorney's fees and costs pursuant to *Hayseeds* for having had to defendant against Nationwide's Complaint. According to the Defendants, in the four months of litigation prior to settlement, they were forced to "hire counsel, research substantive and procedural legal issues, file answers to both federal and state court declaratory judgment actions, file motions, respond to motions, reply to responses, conduct planning meetings, conduct status conferences and otherwise litigate the coverage dispute." All of this, according to the Defendants, cost them a substantial amount of money in attorney's fees and legal costs.

In its Response, Nationwide maintains that the first time the Defendants ever asserted that Holly had been involved in the dog-bite incident was through their Answer and counterclaim, and that once this information was made available to Nationwide, it reopened its investigation and ultimately settled Mr. Faircloth's personal injury claims.

Nationwide argues, first of all, that the services of the Defendants' attorney were not necessary in order to resolve Mr. Faircloth's claim, because once Nationwide became aware of Holly's involvement, it settled Mr. Faircloth's claim. Nationwide's clear implication is that had Nationwide been aware of Holly involvement, it would have settled Mr. Faircloth's claim regardless of whether or not the Defendants hired an attorney.

Second, Nationwide argues that the Defendants did not "substantially prevail" in a claim against Nationwide, because the only "claim" which has ever been in dispute between the Defendants and Nationwide is the claim pertaining to Diver and whether coverage may be properly excluded under a "pit bull exclusion." Nationwide relies on language from the release executed by Mr. Faircloth which stated that "[t]his compensation is not for injuries

9

or damages caused by Diver, as it is an excluded breed of dog . . . [however,] this is a full and final release of all claims related to the loss that occurred on 4-18-11 regardless of which dog caused any injuries or damages." Nationwide argues that because it was never disputed that damages caused by Holly were covered under the Policy, the Defendants could not have "substantially prevailed" as a result of the settlement of the claim for damages caused by Holly.

In their Reply, the Defendants dispute Nationwide's assertion that the first time it learned of Holly's potential involvement was as a result of the Defendants' Answer and counterclaim. The Defendants assert that Nationwide knew of Holly's potential involvement much earlier. According to the Defendants, in a November 17, 2011 letter, Mr. Faircloth, through his attorney, informed Nationwide of the following:

> Boyd Faircloth (81 years old) is very active in the Church where his wife is a licensed minister, and is constantly helping with the ministry in any way that is feasible—until your insured's ***dogs*** viciously attacked him . . .
>
> Without warning, your insured's house-kept ***dogs*** barged past Allen Elliot, lunged at Mr. Faircloth (knocking him to the ground as he fled backwards towards his truck) and savagely mauled him.
>
> ***After struggling with the two dogs*** and managing to free himself sufficiently to crawl into his truck, both of your insured's relatives helped to leash the dogs and get them back inside.

(emphasis added). It is the Defendants' position, therefore, that several months before the Defendants filed their Answer, and almost two months before Nationwide filed the instant declaratory judgment action, Nationwide was provided with clear, unambiguous notice that at least two dogs were involved in causing Mr. Faircloth's injuries.

Moreover, the Defendants point to an even earlier interview conducted by

10

Nationwide's claims adjuster one day after the incident, wherein Defendant Allen Elliot, Jr. recounted the event as follows:

> A: So when I came down the stairs to come outside, I seen Mr. Faircloth on his right side, on the ground, on the concrete, holding Diver. And, uh, the other dog was at his left side, so I shooed her away, and I kept hollering at Diver, finally, I had to haul off and kick Diver in the butt. And that kind of broke his train of though, I guess, and he released his h-, hold on him. And my dad d-, the dog wanted in the house, and I helped the gentleman up and tried to get him back to his truck, 'cause the other dog was still running around there, barking and howling, and trying to come up at us. So now I got him in the truck, and, uh, called 911 to get an ambulance for him. And I was talking with the dispatcher, and they just advised me what to do, put a [inaudible], and, uh, he told me I had to get the other dog c-, uh, contained. So then my dad and I started trying to get her corralled, and we finally got her in the garage, and then about that time the ambulance came . . .
>
> Q: Okay. And, um, what's the other dog's name?
>
> A: Um, Holly [phonetic].
>
> Q: Holly? What type of dog is Holly?
>
> A: I think the, she may, uh [inaudible] called her a, uh, Walker.
>
> Q: Walker something?
>
> A: Walker Hound.

The Defendants argue that based upon this information Nationwide had a clear duty, pursuant to *Fluharty*, *supra*, to investigate Holly's potential involvement prior to denying Mr. Faircloth's claim. Nationwide's failure to conduct such an investigation, argue the Defendants, until after the Defendants had hired an attorney and filed an Answer and

11

counterclaim, coupled with the fact that Nationwide ultimately did settle Mr. Faircloth's claim, entitles the Defendant's to attorney's fees pursuant to **Hayseeds**. The Defendants argue that it cannot be said that they did not "substantially prevail" when Nationwide reversed its initial position and did exactly what the Defendants wanted, for the very reasons that the Defenants wanted.

A material question of fact thus exists with regard to whether or not Nationwide's investigation of Mr. Faircloth's claim was reasonable based upon all available information. *See* **Fluharty**, *supra*, at Syllabus Pt. 3. From the facts which the Court has before it, Lori Fallon, a Nationwide claim representative, conducted at least three separate interviews in the days immediately following the April 18, 2011 incident. The first was an interview of Defendant Allen Elliot, Jr., conducted on April 19, 2011, wherein Mr. Elliot, Jr. made several references to Holly being present at the scene. Importantly, however, Mr. Elliot, Jr. never specifically stated that Holly was attacking Mr. Faircloth, as was Diver. Mr. Elliot, Jr. first states that "the other dog was at [Mr. Faircloth's] right side, so I shooed her away, and I kept hollering at Diver." He then goes on to state that "I helped [Mr. Faircloth] up and tried to get him back to his truck, 'cause the other dog (Holly) was still running around there, barking and howling, and trying to come up at us." Mr. Elliot, Jr. finally goes on to state that "[my dad and I started trying to get [Holly] corralled, and we finally got her in the garage . . . ."

The second interview conducted was an interview of Defendant Allen Elliot, Sr., conducted on April 20, 2011. Mr. Elliot, Sr. makes no reference to Holly's involvement.

The third interview was an interview of Defendant Michelle Elliot, conducted on April

20, 2011. Ms. Elliot was not present at the scene when the incident took place, but relayed by way of hearsay that "[o]ur other dog [Holly] also had run out through the, the open door, and was apparently darting around."

The Court has also reviewed the November 17, 2011 letter written to Nationwide by Mr. Faircloth's attorney asserting that Mr. Faircloth had been attacked by the Defendants' "dogs."

Viewed in the totality, in the light most favorable to Nationwide, the Court cannot conclude that Nationwide's failure to investigate Holly's potential involvement was unreasonable any more than the Court can say that it was reasonable. There was testimony that Holly was present at the scene, which one might reasonably argue should have put Nationwide on notice of Holly's potential involvement, but aside from the letter submitted by Mr. Faircloth's attorney, there was no direct testimony that Holly bit Mr. Faircloth, as there was with regard to Diver.

Whether or not Nationwide's investigation and denial of Mr. Faircloth's claim were reasonable based upon all available information is of central importance to this matter because, as Nationwide argues, "as it was never disputed that damages caused by Holly were covered under the Policy, the Elliots could not have 'substantially prevailed' as a result of the settlement" if the settlement with regard to Holly was separate from the denial with regard to Diver. While it is true that ordinarily in a **Hayseeds** action "[w]hether the defendants acted in good faith is not an issue," see **Burkett v. AIG Claim Services, Inc.**, 2007 WL 2059238, at *3 (N.D. W. Va. July 13, 2007), the instant case is factually distinguishable from **Hayseeds** and its progeny in at least one important regard.

In *Hayseeds*, a former restaurant which was being used as a warehouse burned down under conditions which left no question that the fire had been set by an arsonist. *Hayseeds*, 352 S.E.2d at 75. The primary question was whether or not the insureds had been responsible for setting the fire. *Id.* The insurance company denied the insureds' claim, and the insureds brought an action in West Virginia state court to enforce the policy, as a result of which a jury ultimately returned a verdict for the insureds. *Id.*

Likewise, in *Jordan*, a fire destroyed a business premises, for which the insurance company denied the insureds' claim. *Jordan*, 393 S.E.2d at 648. The insureds were thus forced to hire an attorney to negotiate with the insurer, and they ultimately filed a civil action against the insurer. *Id.* The insureds subsequently reached a settlement agreement with the insurer, which was silent as to the issue of attorney's fees. *Id.* The insureds refused to cash the settlement check because they believed the insurer should be responsible for attorney's fees, and the insurer moved to enforce the settlement. *Id.* The case made its way to the West Virginia Supreme Court of Appeals, which applied *Hayseeds* and found the insurer to be responsible for the insureds' attorney fees. *Id.* at 652.

In *Hadorn*, a plaintiff was injured in an automobile accident when a defendant ran a red light and crashed into the plaintiff's car. *Hadorn*, 456 S.E.2d at 196. The plaintiff settled with the defendant for the policy limits of the defendant's automobile insurance policy, and then the plaintiff pursued an underinsured motorist claim against her own insurance carrier. *Id.* The plaintiff demanaded $300,000.00. The plaintiff's insurer counter-offered with $15,000.00, which amount it subsequently increased to $22,500.00. *Id.* The plaintiff rejected the counter-offer, and the case was tried. *Id.* The jury returned

a verdict of $90,000.00.  *Id.*  The plaintiff then filed a *Hayseeds* action against her insurer, claiming that she had substantially prevailed.  *Id.*  The West Virginia Supreme Court of Appeals found in that case that "[i]t is not clear that 'but for' [the plaintiff's] attorney's services she would not have been able to get [her insurer] to settle for $90,000.00 without proceeding to trial," and the Court thus upheld a lower court's denial of attorney's fees against the insurer.  *Id.* at 198.

In *Fluharty*, the plaintiff was a front-seat passenger in an automobile driven by the defendant's 17-year-old son when the defendant's son lost control of the subject automobile and it was involved in a serious wreck.  *Fluharty*, 500 S.E.2d at 314.  There were two applicable insurance policies involved, both having been issued by the same insurer.  *Id.*  The first was an automobile liability policy purchased by the defendant's family.  *Id.*  The second was an underinsured motorist policy purchased by the plaintiff's family.  *Id.*  The insurer paid the policy limits of the defendant's automobile liability policy, but the plaintiff's underinsured motorist policy had to be litigated.  *Id.* at 314-17.  The West Virginia Supreme Court of Appeals ultimately affirmed a lower court's finding that the insurer "'refused or failed' to evaluate the plaintiff's underinsured motorist claim," and accordingly affirmed the lower court's award of attorney's fees to the plaintiff pursuant to *Hayseeds*.  *Id.* at 325.

The aforementioned cases are distinguishable from the issue now facing this Court because in the case *sub judice* there potentially exists, depending on how one views the facts, more than one claim and/or denial/settlement.  If a fact-finder were to determine that Nationwide's initial investigation of this matter was reasonable based upon all available information, that is to say, that it was reasonable for Nationwide not to suspect any

15

potential involvement by Holly until Nationwide received notice through the Defendants' Answer and counterclaim, then Nationwide's initial denial of Mr. Faircloth's claim was not a denial as to Holly, and the Defendants cannot be said to have "substantially prevailed" in their counterclaim against Nationwide based upon that denial.  After all, Nationwide settled Mr. Faircloth's claim shortly after the Defendants filed their Answer, specifically stating that "[t]his compensation is not for injuries or damages caused by Diver, as it is an excluded breed of dog."

If, on the other hand, a fact-finder were to determine that Nationwide's initial investigation of this matter was not reasonable based upon all available information, that is to say, that Nationwide should have been aware of Holly's potential involvement, but nevertheless denied Mr. Faircloth's claim until the Defendants were forced to hire counsel and file a counterclaim to Nationwide's declaratory judgment action, then the Defendants would be able to assert a *prima facie* case for attorney's fees and costs pursuant to **Hayseeds** and its progeny.  The Defendants could be said to have "substantially prevailed" in such a case because the action was settled for an amount equal to or approximating the amount claimed by the insured immediately prior to the commencement of the action.  *See, e.g.,* **Fluharty**, *supra*, at Syllabus Pt. 2.

The central question to be resolved at this point in the case, then, is whether Nationwide's handling of Mr. Faircloth's claim is to be viewed as one claim, in which Nationwide was aware of both Diver's and Holly's involvement but chose nevertheless to deny Mr. Faircloth's claim based on its "pit bull exclusion" until the Defendants were forced to hire counsel and file a counterclaim, prompting Nationwide to settle, or whether

Nationwide's handling of Mr. Faircloth's claim is to be viewed as, essentially, two separate claims, in which Nationwide denied the first claim based upon Diver's being subject to a "pit bull exclusion," but honored the second claim once it was brought to Nationwide's attention that Holly was potentially involved and that Holly was not an excluded breed of dog. If the former is the case, then summary judgment in favor of the Defendants would be proper. If the latter is the case, then summary judgment in favor of the Defendants would not be proper, because they would not be able to show that they had "substantially prevailed" against Nationwide's denial of coverage as to Diver.

The existence of such a material question of fact precludes the granting of summary judgment at this time, and the Defendants' motion is accordingly **DENIED**.

### 2. Plaintiff's Motion for Summary Judgment on Declaratory Judgment Action

In its Motion for Summary Judgment on Declaratory Judgment Action, Nationwide seeks to have the Court rule on its Complaint for Declaratory Judgment, despite having already settled this case with Mr. Faircloth. Nationwide requests that this Court find as a matter of law that Nationwide does not owe the Defendants personal liability and medical payments coverage under its homeowners insurance policy for any bodily injury or property damage caused by Diver

The Court finds, however, that Nationwide has rendered its motion moot be settling with Mr. Faircloth. "A mootness determination is ultimately grounded in Article III considerations, particularly the 'case or controversy' requirement, because courts are not empowered to decide moot cases, and decision of moot matters should not be made when it would be merely advisory." *W. Virginia Highlands Conservancy v. Norton*, 161 F.

Supp. 2d 676, 679 (S.D.W. Va. 2001) (citing 13A *Federal Practice and Procedure* § 3533.1). "A claim is moot if it has lost its character as a present, live controversy." *Id.* (citing **American Tunaboat Ass'n v. Brown**, 67 F.3d 1404, 1407 (9th Cir.1995)). "Action by a defendant that simply accords all the relief demanded by the plaintiff may moot an action." *Id.* (citing 13A *Federal Practice and Procedure* § 3533.2). "If nothing further would be ordered by the court, there is no point in proceeding to decide the merits." *Id.*

Nationwide argues that its declaratory judgment action is not moot because it did not pay any money to settle Mr. Faircloth's claims for injuries or damages caused by Diver. However, Mr. Faircloth is no longer advancing any claims at all. Regardless of the basis of Nationwide's settlement with Mr. Faircloth, it did settle and there is no longer any active case or controversy between the parties with respect to liability for the dog bite at issue. Any declaratory judgment issued by this Court, then, would be purely advisory in nature.

Nationwide argues that "successful resolution of this declaratory judgment action will directly impact the 'substantially prevails' analysis under **Hayseeds** and the ultimate resolution of the Elliots' counterclaims," but as has already been discussed, resolution of the Defendants' **Hayseeds** claim will turn on factual determinations that do not require a ruling from this Court on Nationwide's declaratory judgment action. The central question in the Defendants' **Hayseeds** action is when Nationwide knew or should have known of Holly's involvement, not whether or not Diver was an excluded breed of dog.

Nationwide's Motion for Summary Judgment on Declaratory Judgment Action is, therefore, **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Partial Summary Judgment **[Doc. 34]** is **DENIED**. The Plaintiff's Motion for Summary Judgment on Declaratory Judgment Action **[Doc. 41]** is also **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record and/or *pro se* parties.

**DATED:** November 9, 2012.

GINA M. GROH
UNITED STATES DISTRICT JUDGE